UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JERMAINE E. FAVORS                          CIVIL ACTION

VERSUS                                      NO.  13-491

N. BURL CAIN, WARDEN                        SECTION "G"(5)

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2).  For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.[1]

---

[1]    Under  28  U.S.C.  §  2254(e)(2),  whether  to  hold  an evidentiary  hearing  is  a  statutorily  mandated  determination. Section  2254(e)(2)  authorizes  the  district  court  to  hold  an evidentiary  hearing  only  when  the  petitioner  has  shown  either  that the  claim  relies  on  a  new,  retroactive  rule  of  constitutional  law that  was  previously  unavailable,  28  U.S.C.  §  2254(e)(2)(A)(i),  or the  claim  relies  on  a  factual  basis  that  could  not  have  been previously  discovered  by  the  exercise  of  due  diligence,  28  U.S.C. §  2254(e)(2)(A)(ii);  and  the  facts  underlying  the  claim  show  by clear  and  convincing  evidence  that,  but  for  the  constitutional

Petitioner, Jermaine E. Favors, is a state prisoner incarcerated in the Louisiana State Penitentiary, in Angola, Louisiana. On November 29, 2007, Favors was charged by grand jury indictment with second degree murder in violation of La. R.S. 14:30.1.[2] Favors pleaded not guilty.[3] On May 28, 2009, after a two-day jury trial, he was found guilty of second degree murder. Favors was sentenced on August 31, 2009 to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.[4]

On direct appeal, Favors' appointed counsel raised two assignments of error: (1) the trial court erred in admitting into evidence recorded phone calls because the State failed to lay a proper foundation and satisfy the requirements of the Electronic Surveillance Act, La. R.S. 15:1301 *et seq.*; and (2)the trial court

---

error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

[2] State Rec., Vol. 6 of 9, Bill of Indictment by the Jefferson Parish Grand Jury.

[3] State Rec., Vol. 1 of 9, Minute Entry 12/6/07.

[4] State Rec., Vol. 8 of 9, Transcript of sentencing proceedings held August 31, 2009, p. 17. A motion in arrest of judgment and alternatively motion for new trial was also raised and denied. Id. at 18-19; State Rec. Vol. 6 of 9.

improperly denied him the right to confront a witness against him by restricting his cross-examination of Dominique Hill.   The Louisiana Fifth Circuit Court of Appeal affirmed his conviction and sentence on June 29, 2010.[5]  The Louisiana Supreme Court denied his subsequent writ application without stated reasons on February 4, 2011.[6] Favors did not seek review to the United States Supreme Court.

On November 3, 2011, Favors submitted a *pro se* application for post-conviction relief to the state district court.[7]  In his application, he raised the following claim for relief: (1) Counsel

---

[5]   State v. Favors, 09-1034(La. App. 5th Cir. 6/29/10), 43 So.3d 253; State Rec., Vol. 4 of 9, Tab 2.

[6]   State v. Favors, 2010-1761 (La. 2/4/11), 57 So.3d 309; State Rec., Vol. 9 of 9.

[7]   State Rec., Vol. 4 of 9, Uniform Application for Post-Conviction Relief dated November 3, 2011.  Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006).  If that date cannot be gleaned from the state court record with respect to the filings in this case, this Court will simply use the signature date of the applications as the filing date, in that the various applications were obviously placed in the mail no earlier than the date they were signed. In those instances where no signature date appears on a document and no other evidence is available, the Court will look to the file-stamp placed on the document by the clerk of court.

failed to subject the prosecution's case to any meaningful adversarial testing in violation of the Sixth and Fourteenth Amendments of the United States Constitution and Article 1 §§ 2, 13 and 16 of the Louisiana Constitution of 1974 when counsel failed to present a valid alibi defense on his behalf, to introduce crucial evidence for the jury's consideration, to properly prepare for trial, to render meaningful investigation, to confront his accuser, and to render crucial cross-examination.[8] On April 3, 2012, the district court denied the ineffective assistance of counsel claim on the merits with written reasons.[9]

On May 7, 2012, Favors filed his writ application in the Louisiana Fifth Circuit Court of Appeal.[10] On May 31, 2012, the court of appeal denied relief with written reasons, finding no error in the district court's denial of the ineffective assistance of counsel claim.[11] On July 3, 2012, Favors filed a request for supervisory writ of review in the Louisiana Supreme Court.[12] On

---

[8]  Id. at p. 8

[9]  State v. Favors, No. 07-6079 "A" (4/3/12); Id., Tab 7.

[10]  State Rec., Vol. 9 of 9, Tab 13.

[11]  State v. Favors, 12-423 (La. App. 5th Cir. 5/31/12); State Rec., Vol. 4 of 9, Tab 4.

[12]  State Rec., Vol. 9 of 9, Tab 15.

November 9, 2012, the Louisiana Supreme Court denied relief without stated reasons.[13]

On November 29, 2012, Favors filed his federal application for *habeas corpus* relief.[14] In his petition, Favors raises the following claims:  (1) Counsel failed to subject the prosecution's case to any meaningful adversarial testing in violation of the Sixth and Fourteenth Amendments of the United States Constitution and Article 1 §§ 2, 13 and 16 of the Louisiana Constitution of 1974; (2) counsel failed to present a valid alibi defense on his behalf, to introduce crucial evidence for the jury's consideration, to properly prepare for trial, to render meaningful investigation, to confront his accuser, and to render crucial cross-examination; (3) the trial court erred in allowing into evidence recordings of private

---

[13] State ex rel. Jermaine Favors v. State, 2012-1607 (La. 11/9/12), 100 So.3d 832; State Rec., Vol. 4 of 9, Tab 1.

[14] Rec. Doc. No. 1, Petition. "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). The clerk of court filed the petition on March 15, 2013, when the filing fee was paid.  Petitioner dated his signature on the petition as November 29, 2012, which is presumed to be the earliest date on which it could have been delivered to prison authorities for mailing. The fact that Favors later paid the filing fee does not alter the application of the mailbox rule to his pro se petition.  See Cousin v. Lensing, 310 F.3d 843, 847 (5th Cir. 2002).

telephone calls made by petitioner from the Jefferson Parish Correctional Center as the state failed to carry its burden of their admissibility; and (4) the trial court improperly restricted petitioner's confrontation rights in his efforts to cross-examine a witness.

The State filed a response conceding that the federal application is timely and that petitioner exhausted his remedies in the state courts (with the sole exception of a portion of the fourth claim).[15] Favors filed a reply re-urging the merits of his four claims and arguing that his fourth claim was properly exhausted.[16]

## I.   Standards of Review on the Merits

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. §2254. The AEDPA went into effect on April 24, 1996[17] and applies

---

[15]   Rec. Doc. No. 12, pp. 2-3.

[16]   Rec. Doc. No. 13.

[17]   The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir.1992).

6

to habeas petitions filed after that date. <u>Flanagan v. Johnson</u>, 154 F.3d 196, 198 (5th Cir.1998) (citing <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997)). The AEDPA therefore applies to this petition which is deemed filed in this federal court on November 29, 2012.

Subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); <u>see also</u> 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness

7

by clear and convincing evidence.").

As to pure questions of law or mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir.) (internal quotation marks, ellipses, brackets, and footnotes omitted), cert. denied, 131 S.Ct. 294 (2010).

Regarding the "unreasonable application" clause, the United States Supreme Court has explained:

8

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000). The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams that an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; see also Puckett v. Epps, 641 F.3d 657, 663 (5th Cir.2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."), cert. denied, 132 S.Ct. 1537 (2012).

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court recently held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

<u>Harrington v. Richter</u>, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added); <u>see also</u> <u>Renico v. Lett</u>, 559 U.S. 766, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

## II.  Facts

On direct appeal, the Fifth Circuit Court of Appeal summarized the facts as follows:

> In April of 2007, Jonathan Terhune, the victim, was temporarily staying at friend, Misty Fontenot's, home located at 2405 Sunny Meade Drive in Harvey, Louisiana. On April 30, 2007, at approximately 10:45 p.m., Mr. Terhune went outside to smoke a cigarette and make a call

10

to Jessica Miller, his estranged girlfriend and the mother of his one-year-old son, on his cell phone. As Miss Miller was talking to Mr. Terhune on the phone, she suddenly heard a "guy" say in an aggressive tone, "Drop your pants, and give me your cell phone." She then heard Mr. Terhune say, "Oh sh*t. Oh, sh*t."

At that same time, Ms. Fontenot was inside the house rocking her son to sleep when she heard a "pop," which she thought was a gunshot. She looked out the window and saw Mr. Terhune. She also saw a white sport utility vehicle (SUV) in the street backing up with someone's foot hanging out of the bottom of the door. There were people inside the vehicle, one of whom was wearing a white T-shirt and had a "twisted" hairstyle and a mask or "something" on his face.

Ms. Fontenot heard Mr. Terhune yelling, "Mama," which is what he called her mother. She ran outside, went to Mr. Terhune, and picked up his cell phone. Mr. Terhune repeatedly told her that his hip or his leg hurt. She hung up his cell phone and called 911. When the paramedics arrived, she hung up the phone again and called John Roquemore, Mr. Terhune's stepfather, and told him what happened. Mr. Roquemore came to the scene, went inside the ambulance, and saw a bullet hole in Mr. Terhune's left thigh region. Despite the efforts of the medical personnel in the ambulance, Mr. Terhune died en route to University Hospital.

The initial investigation of the murder did not produce a suspect. Ms. Fontenot went to the detective bureau, after which the detectives took her to the parking lot of a Capital One Bank to possibly identify three individuals they had just stopped in a white SUV. Ms. Fontenot told the detectives that the physical characteristics of those individuals looked similar to the suspects, and she said that that was the vehicle she saw at the scene. However, the detectives thoroughly investigated those individuals, but the detectives determined that they were not involved in Mr. Terhune's murder, as they had corroborating alibis. The detectives also determined that that vehicle

11

was not involved in the homicide.

About two months later, Ms. Fontenot found an unsigned, handwritten note addressed to the Terhune family on her doorstep. The note stated the cousin of Mr. Terhune's murderer lived in the Richfield Apartments, in building 601-610 in the first apartment downstairs as soon as you turn left. The note also indicated that the individual was with his cousin, the murderer, the night Mr. Terhune was killed. Miss Fontenot brought the note to the detective bureau. The ensuing investigation led to the arrest of Favors.

Detective Keith Locascio of the Jefferson Parish Sheriff's Office (JPSO) and others went to the Richfield Apartments and learned that Dominique Hill lived in the apartment referenced in the note. They ultimately located Hill and learned that he and Favors were first cousins. Hill told the detectives that, on the night in question, he was in the rear of a minivan owned by Carl Wilson and that Wilson was driving and Favors was sitting in the passenger seat. Hill also said that Favors exited the vehicle and shot the victim. The detectives arrested Hill, Wilson, and Favors.

Wilson was released when an examination of his truck revealed that it was used in a car washing business and that it had two front seats and a 100-gallon water tank behind those seats, which would not allow someone to sit in the back, contradicting Hill's story. Wilson also told the detectives that the night Hill was arrested, Favors called Wilson to come and pick him up. Wilson complied. Favors told Wilson that he and Hill were in Wilson's van and that they went into the Woodmere Subdivision and that Favors shot "the boy in Woodmere."

When Wilson and Favors arrived at Wilson's residence, Wilson's mother, Pamela Wilson, sensed something was wrong. Favors told her that he was responsible for the male subject being shot in Woodmere and that he was going to have to leave town. Favors also stated that he and Hill were in Wilson's van at the time, but that (Carl)

Wilson was not present. Mrs. Wilson gave the detectives this information. After an investigation, the detectives no longer believed that Carl Wilson was in the vehicle at the time of the shooting, and the district attorney refused charges on him.

In November of 2007, the detectives spoke to Hill again, who admitted that he drove the van, and that (Carl) Wilson was not present at the time Favors shot the victim. Hill said he had lied in his first statement because he was afraid.

The detectives subsequently received information regarding recorded phone calls that Favors had made to Wilson from jail. Detective Locascio applied for and received a court order to obtain those recordings from the Jefferson Parish Correctional Center (JPCC). Those phone calls, which were played for the jury, revealed that Favors was pressuring Wilson to change his story at trial. Wilson contacted Favors' attorney in order to provide an alibi for Favors; however, Wilson changed his mind and decided not to give a statement to that effect.

Favors' original attorney, Hilliard Fazande, II, testified that Wilson refused to sign an affidavit, not because the affidavit was untrue, but because Wilson was fearful of his life from the actual murderer and because he was afraid the State would prosecute him and his mother for perjury.

Deborah Hill, Dominique Hill's mother, testified that, when (Dominique) Hill was first arrested in August of 2007, Favors called her. He said, "Tweety, they didn't have nothing." When she said the police had her son, Favors told her he was not going to throw his life away. She said, "What about Dominique's life?," but Favors had no response.

Dominique Hill testified that he and Favors are first cousins. On April 30, 2007, the two men were riding in Wilson's van and smoking marijuana. Hill was driving and Favors was in the front passenger seat. At approximately

10:30 p.m., as they were driving down Sunny Meade in the Woodmere Subdivision, Favors told Hill to pull over. Hill saw a "white guy" standing there and talking on his cell phone, and Hill thought Favors might know the man.

Hill pulled over as Favors requested. Favors exited the van, took a bandanna from around his neck, tied it across his face, and pulled out a gun from his waistline. Favors said, "Give it up. Take off your pants." When the "guy" did not respond, Favors shot one time, and the "guy" fell on the ground.

Favors got back into the van and told Hill to pull off. Hill testified that he knew Favors owned a gun, but he did not know Favors had the gun on him, nor did he know that Favors was going to rob or shoot the victim when he pulled over. After they left the scene, Hill and Favors went to Hill's house. When they arrived, Hill went inside and Favors left in the van.[18]

Favors testified at trial. He stated that he was working at Wilson's business washing cars, and "Charlie" was plastering walls inside the business on the day of the murder. After 7:20 p.m., he and Wilson brought "Charlie" home and went back to Wilson's business at approximately 8:00 p.m. for three or four hours. Favors contended that he was at Wilson's shop until approximately midnight on April 30 and was never in Woodmere. He also denied that he shot or tried to rob anyone.

Favors denied having twisted hair at the time of the incident, and he asserted that it was not a practice for him to wear bandannas. He claimed that Hill was the individual who shot the victim. Favors further testified that he never owned a handgun.

During the trial, several tapes made by Favors to Wilson from the JPCC were played for the jury. These tapes were

_____

[18] Hill ultimately pled guilty to accessory after the fact to murder and received a five-year sentence (footnote in original).

the subject of a continuing objection by defense counsel
during trial as well as a subject of a pre-trial motion
to suppress. The trial judge ultimately denied the motion
to suppress the recorded telephone conversations as
follows:

I'm going to deny the motion to suppress the statements
that were recorded in the jail where the defendant
is pre-warned and the recipient is warned, and there's no
expectation of privacy to those tapes. I think that's
been going on in the jail since the jail, you know, has
been in existence, those calls are taped. Okay.

With respect to the recorded phone conversations, Carl
Wilson testified that Favors contacted him by phone. The
tape of the September 22, 2008 phone call was played for
the jury. As to that call, Wilson said that Favors seemed
to suggest that the reason Favors told Wilson and his
mother that he shot the victim was because Favors thought
they would not tell anyone. Wilson thought Favors
admitted to the shooting in order to help Dominique Hill.
Wilson remembered that Favors told him in that
conversation, "Stop me from getting life, son ... if you
got that power ... why not do it, son?" Wilson said he
had the power to help Favors.

The tape of the phone call on April 9, 2009, at 12:53
p.m., was played for the jury. Favors told Wilson the
story would be that they were at work on the day of the
incident, that they brought Charlie home about 7:15, and
then they came back to the shop where they stayed until
midnight gutting the inside of the building. Favors also
told Wilson that his attorney wanted Wilson to call and
let him know if his story was the same as that of Favors.
Favors told Wilson during that conversation that the
worst that would happen if Wilson came to court and
helped him out would be an obstruction of justice charge
with a six-month sentence, since that would be Wilson's
first offense. Wilson indicated that conversation took
place because Favors was instructing Wilson on what to
say to coordinate the stories so Favors could be out of
jail on the first.

The tape of the conversation of April 9, 2009, at 8:11 p.m., was played for the jury. Wilson explained that, in that conversation, Favors indicated he was going to have his family and his friends come in to court to intimidate Wilson into not saying anything. Wilson also explained that he was upset because he thought Favors was trying to pressure him about doing something Favors wanted him to do, and Favors did not take his word for it that he would do it. Wilson testified that Favors was his lifelong friend, and he would have done anything he could to help him, even serving jail time for him. Wilson explained there was a part of the conversation where he told Favors he was being selfish by using Wilson's vehicle during the offense and putting Wilson, his business, and his mother at risk.

The tape of the conversation of April 27, 2009, at 7:47 a.m., was played for the jury. During that conversation, Wilson referred to the prosecutors as "b*tches," because, by that time, he realized that the phone calls were being recorded, and the prosecutors knew everything that he and Favors were saying to one another about the incident. When Wilson referred to "switching things," he was talking about switching stories or testimony, and he knew that was not going to work anymore. Wilson remembered part of the conversation in which Favors told him he could plead the Fifth and would not have to testify. Wilson testified that he told the truth to the jury and that Favors, not Hill, shot the victim. Wilson did not change his statement because that would be lying, and he might be charged with perjury.

Favors denied trying to coerce or intimidate Wilson into changing his statement. He claimed he was trying to remind Wilson that he was with him the night of the incident and that Wilson had the power to free him. Favors admitted telling Wilson that, if he was scared, he could plead the Fifth, and he would not have to say

anything.[19]

## III. Petitioner's Claims

### A.   Ineffective Assistance of Counsel

Favors asserts two interrelated claims of ineffective assistance of counsel:   (1) counsel failed to subject the prosecution's case to any meaningful adversarial testing in violation of the Sixth and Fourteenth Amendments of the United States Constitution and Article 1 §§ 2, 13 and 16 of the Louisiana Constitution of 1974; and (2) counsel failed to present a valid alibi defense on his behalf, to introduce crucial evidence for the jury's consideration, to properly prepare for trial, to render meaningful investigation, to confront his accuser, and to render crucial cross examination.   Favors presented these two claims together as a single claim of error in his application for post-conviction relief through each of the state courts.

The state district court rejected petitioner's claims of ineffective assistance of counsel raised on post-conviction relief. In its stated reasons, the district court concluded, in relevant part:

---

[19]   State v. Favors, 09-1034(La. App. 5th Cir. 6/29/10), 43 So.3d 253, 255-259; State Rec., Vol. 4 of 9.

The defendant mainly questions and second-guesses counsel's trial strategy. The court finds that counsel aggressively cross-examined witnesses and advocated on behalf of the defendant.

The Supreme Court has emphatically directed that, "in evaluating the performance of counsel, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigations." Strickland, 466 U.S. at 690-691, 104 S.Ct. 2052, 80 L.Ed.2d 674.

The defendant's argument pertaining to alibi witnesses is purely speculative and has no evidence in support thereof. The court finds no merit to this claim.

* * *

As to defendant's complaint blaming his attorney for allowing him to testify on his own behalf, the court finds that the defendant had the right to testify, and this decision was made by defendant. The court finds no merit to this claim.

The court finds as a matter of law that the petitioner has failed to meet his burden of proof or to prove a violation of the Strickland standard. Defendant's claim of ineffective assistance of counsel attacks trial counsel's strategic decisions, and does not establish a basis for granting relief. This court additionally finds that the defendant fails to prove prejudice, and does not prove that the outcome would have been different had counsel performed differently.[20]

The Fifth Circuit likewise denied relief. In stated reasons,

---

[20] State v. Favors, No. 07-6079 "A" (4/3/12); State Rec., Vol. 4 of 9, Tab 7.

the court of appeal concluded:

In his application for post-conviction relief, relator claimed, in part, that counsel rendered ineffective assistance by failing to present a valid alibi defense, failing to introduce crucial evidence at trial, failing to properly prepare for trial, failing to conduct a meaningful investigation and crucial cross-examinations, and failing to confront his accuser. These challenges to counsel's performance involve matters of trial strategy.

Under our adversary system, once a defendant has the assistance of counsel, the vast array of trial decisions, strategic and tactical, that must be made before and during trial rest with the defendant and his attorney. State v. Buckenberger, 07-1422 (La. App. 1st Cir. 2/8/08), 984 So.2d 751, 759, writ denied, 08-0877 (La. 11/21/08), 996 So.2d 1104. A defendant must overcome a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Specifically, a defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. An alleged error that is within the ambit of trial strategy does not establish ineffective assistance of counsel because opinions may differ on the advisability of such a tactic. State v. Johnson, 9 So.3d at 1093.

In ruling on relator's claims relating to counsel's trial strategy, the district court found that "counsel aggressively cross-examined witnesses and advocated on behalf of the defendant." The district court further noted that "defendant's argument pertaining to alibi witnesses is purely speculative." We have reviewed relator's allegations relating to counsel's trial strategy and find, as did the trial court, that relator failed to prove ineffective assistance of counsel as set forth in Strickland v. Washington, supra.

* * *

Lastly, relator also asserted in his application for

19

post-conviction relief that counsel was ineffective for allowing him to testify on his own behalf.  As noted by the district court, defendant had the right to testify on his own behalf.  The Louisiana Supreme Court has noted that a defendant's constitutional right to testify should be treated as fundamental.  In addition, a defendant has the right to ultimately choose whether or not to testify. State v. Hampton, 00-0522 (La. 3/22/02), 818 So.2d 720, 724.

Accordingly, we find no error in the district court's denial of relator's application for post-conviction relief based on his allegations of ineffective assistance of counsel.  This writ is denied.[21]

The Louisiana Supreme Court denied his related writ application without additional reasons assigned.

The issue of ineffective assistance of counsel is a mixed question of law and fact. Clark v. Thaler, 673 F.3d 410, 416 (5th Cir.2012); Woodfox v. Cain, 609 F.3d 774, 789 (5th Cir.2010). Thus, the question before this court is whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

The standard for judging performance of counsel was established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 688 (1984), in which the Supreme Court established a two-part test for evaluating claims of ineffective

---

[21] State v. Favors, 12-423 (La. App. 5th Cir. 5/31/12); State Rec., Vol. 4 of 9, Tab 4.

assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice. Id., 466 U.S. at 697. The Supreme Court held first that, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir.1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. Kimler, 167 F.3d at 893. A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' ... But it is not enough under Strickland, 'that the errors had some conceivable effect on the outcome of the proceeding.'" (citation omitted) Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir.1994) (quoting Strickland, 466 U.S. at 693); Harrington v. Richter, --- U.S. ----, 131 S.Ct. 770, 792 (2011) (Strickland requires a "substantial" likelihood of a different

result, not just "conceivable" one.)

On habeas review, the United States Supreme Court has recently clarified that, under Strickland, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington, 131 S.Ct. at 788. The Harrington Court went on to recognize the high level of deference owed to a state court's findings under Strickland in light of the AEDPA:

> The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington, 131 S.Ct. at 788.

Thus, scrutiny of counsel's performance under § 2254(d) is "doubly deferential." Cullen v. Pinholster, --- U.S. ----, 131 S.Ct. 1388, 1403 (2011) (quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)). This court must therefore apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance."

<u>Strickland</u>, 466 U.S. at 690.

Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise by the petitioner. <u>Strickland</u>, 466 U.S. at 689; <u>Geiger v. Cain</u>, 540 F.3d 303, 309 (5th Cir.2008). In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. <u>Strickland</u>, 466 U.S. at 689; <u>Neal v. Puckett</u>, 286 F.3d 230, 236-37 (5th Cir. 2002); <u>Clark v. Johnson</u>, 227 F.3d 273, 282-83 (5th Cir.2000), <u>cert. denied</u>, 531 U.S. 1167 (2001). Tactical decisions when supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance. <u>Lamb v. Johnson</u>, 179 F.3d 352, 358 (5th Cir.1999), <u>cert. denied</u>, 528 U.S. 1013 (1999) (citing <u>Rector v. Johnson</u>, 120 F.3d 551, 564 (5th Cir.1997) and <u>Mann v. Scott</u>, 41 F.3d 968, 983-84 (5th Cir.1994)).

**1. No meaningful adversarial testing, cross-examination and confrontation, or presentation of crucial evidence**

Favors contends that trial counsel did not actively advocate on his behalf by subjecting the prosecution's case to meaningful

adversarial testing.  In particular, he argues that counsel failed to properly cross-examine numerous witnesses to elicit testimony that in his estimation would have supported his account that Dominique Hill actually shot the victim. The State submits based on the record that defense counsel was well-prepared for trial and actively advocated on behalf of his client at all stages of the proceedings, exploring the relevant areas of potentially favorable witness testimony and possible bias on the part of State witnesses.

The court will address each of petitioner's arguments with regard to each witness in turn.  Favors first contends that Misty Fontenot's testimony could have established that Hill was the driver and trigger man, if not for counsel's "failure to push the testimony forwarded [sic] for the jury to show that this witness saw the driver side door ajar and a foot hanging out as the van drove away."[22]  To the contrary, a review of defense counsel's cross-examination reveals that he did, in fact, explore this issue with this witness to the fullest extent possible, particularly given her admission that she was more focused on the victim than

---

[22]  Rec. Doc. No. 1, Memorandum in Support, p. 8.

24

the vehicle.[23]  From a review of the record, it is clear that the testimony was presented to the jury to weigh and consider, in light of Hill's testimony that he was driving the vehicle that night, but that he did not get out of the vehicle at any point during the incident.

Next, Favors contends that defense counsel should have cross-examined Jessica Miller, the victim's girlfriend, with regard to voice recognition since she was on the other end of the cell phone with the victim when he was shot, and heard the perpetrator say in an aggressive tone, "Drop your pants, and give me your cell phone." According to Favors, defense counsel should have explored whether she recognized Hill's voice at trial in order to identify the shooter.

Counsel's decision not to explore voice recognition with this witness was not deficient.  Miller overheard only nine words spoken by the perpetrator through a cell phone more than two years before the trial of this matter.  She testified that it was not a voice she recognized as either the victim's, or any friend of the

---

[23]  State Rec., Vol. 7 of 9, Trial Transcript (Day 1), pp. 27-29. Defense counsel also elicited testimony from Detective Donald Meunier as to Misty Fontenot's account that she saw a foot hanging from the driver's side door.  Id. at p. 97.

victim's.[24]  Her testimony in this regard neither helped nor hurt Favors as she was unable to identify the voice she heard. Petitioner's contention that she would have identified Hill as the voice of the perpetrator she overheard on the phone is sheer speculation.  Defense counsel's decision to not cross-examine her on this issue falls within the realm of sound trial strategy.

Favors also contends that defense counsel failed to properly cross-examine Dominique Hill's mother, Deborah, "concerning her tactics used and tampering with the investigation."[25]  Favors argues that defense counsel should have exposed the lengths to which Deborah Hill would go to save her son.

Deborah Hill testified on direct examination that Favors called her on the phone after Dominique was arrested and told her, "they didn't have nothing" and that "he wasn't going to throw his life away."[26]  She also testified regarding how she searched for Favors and Wilson and turned them into the police.[27]  Contrary to petitioner's contention, the record shows that defense counsel

---

[24]  State Rec., Vol. 7 of 9, Trial Transcript (Day 1), p. 33.

[25]  Rec. Doc. No. 1, Memorandum in Support, p. 10.

[26]  State Rec., Vol. 8 of 9, Trial Transcript (Day 2), p. 10.

[27]  Id. at p. 11.

fully explored not only her actions but her motivation behind her actions to the extent possible.[28]  She was not only Hill's mother, but also Favors' aunt, and admitted she was upset about the whole matter because it was her nephew and her son.[29]  She explained she was looking for Favors not to help her son, but "to get to the bottom of it and "to figure out what went on."[30]  It is clear that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment." Ford v. Cockrell, 315 F.Supp.2d 831, 859 (W.D.Tex.2004),aff'd, 135 Fed. App'x 769 (5th Cir.2005).  Defense counsel's decision not to cross-examine the witness more vigorously falls soundly within the realm of reasonable trial strategy.

Next, Favors contends that defense counsel was ineffective in failing to object when Dominique Hill's attorney, Gerard Archer, sought to prevent Hill from asserting a Fifth Amendment privilege against self-incrimination.  Specifically, Favors argues that by failing to object, defense counsel allowed Archer to testify

---

[28]  Id. at pp. 12-14.

[29]  Id. at p. 13.

[30]  Id.

concerning a state witness' right not to testify, and that Archer's statement prejudiced the jury. A review of the state court record reveals, however, that when Hill asserted a Fifth Amendment privilege, Mr. Archer asked to approach the bench.  The transcript reveals that all discussions beyond this point were conducted outside of the hearing of the jury.[31]  Thus, the jury did not hear and could not be influenced by Mr. Archer's statement that Hill did not have any Fifth Amendment right to assert because he had pled guilty and been sentenced for being an accessory after the fact.[32] A review of the record shows that defense counsel was present and continued to advocate on Favors' behalf during the colloquy with the trial court, and that he monitored the discussions between Mr. Archer and Hill, who ultimately decided to testify.[33]  Favors has not shown that defense counsel's failure to object to Mr. Archer's statement was deficient or that Favors suffered any prejudice as a result.

Favors also contends that defense counsel failed to challenge

---

[31]  State Record, Vol. 8 of 9, Trial Transcript (Day 2), pp. 20-27.

[32]  Id. at p. 22.

[33]  Id. at 20-27.

28

the substance of Hill's testimony on cross-examination by showing that he entered a plea agreement with the state in exchange for his testimony, and that he was motivated by his desire to save himself. In this case, there is no evidence that the plea offer was conditioned on Hill providing testimony against Favors. In fact, the record indicates that no such plea agreement was ever negotiated.[34] There was no reason for defense counsel to question Hill about the existence of a plea agreement. Furthermore, the record shows that defense counsel extensively cross-examined Hill to challenge his credibility and to show that he was motivated by self-interest. The record shows that defense counsel cross-examined Hill regarding the three different statements he gave to police and his initial false story.[35] It further shows that defense counsel attempted to discredit Hill's testimony that Favors shot the victim.[36] Favors has failed to make a showing of any deficient

---

[34] *Id*. at p. 21. Counsel for the State, Mr. Smith, advised the Court that there was no plea agreement.

[35] *Id*. at pp. 53-55.

[36] Defense counsel questioned Hill regarding how he could have overheard what Favors said to the victim if Hill was, as he testified, in the driver's seat, with the windows up, and the radio on. *Id*. at pp. 46-50. The State on redirect elicited testimony that the passenger door remained open and the van was in close proximity to the victim. *Id*. at pp. 63-64.

performance by counsel.

Favors also contends that defense counsel was ineffective in his cross-examination of Wilson's mother, Pamela Wilson Adams, because he failed to show that her testimony was motivated by threats of prosecution against her son.  However, Detective Keith Locascio had already testified that after a full investigation, they determined that Carl Wilson was not in the vehicle at the time of the shooting, and that they consulted with the district attorney's office and as a result the State decided to refuse the charges on Carl Wilson.[37]  Thus, Favors cannot establish that counsel's failure to explore this issue on cross-examination was the result of deficient representation rather than a strategic choice.  Nor can Favors show that he was prejudiced in any manner by counsel not questioning the witness about threats of prosecution against her son.

In sum, petitioner's purely speculative attempts to second-guess counsel's trial strategy is wholly inadequate to meet his burden of proof to show either that his counsel performed deficiently or that prejudice resulted.  The state courts' denial

---

[37]   State Rec., Vol. 7 of 9, Trial Transcript (Day 1), p. 136.

of relief on this issue was not contrary to, or an unreasonable application of, <u>Strickland</u>.

### 2.    **Failure to present an alibi defense**

Next, Favors contends that defense counsel was ineffective in failing to present an alibi defense.  According to Favors, Carl Wilson was prepared to present an alibi defense on his behalf, but counsel failed to do so.  Favors suggests that defense counsel should have presented facts to the jury that Wilson was influenced by the threat of prosecution to abandon his testimony that would have provided an alibi for Favors.

The record shows that defense counsel exercised sound trial strategy in handling this issue.  Defense counsel presented the testimony of Hilliard Fazande, II, who served as initial defense counsel for Favors.  Fazande testified that Wilson initially agreed to provide an alibi for Favors and agreed to provide an affidavit to that effect.  Based on this, Fazande filed a notice of alibi witness into the record.  However, Wilson subsequently decided not to provide an affidavit or alibi.[38]  Fazande further testified that Wilson told him he refused to sign the affidavit, not because it

---

[38] State Rec., Vol. 8 of 9, Trial Transcript (Day 2), pp. 142-143.  Mr. Fazande subsequently withdrew and new counsel was appointed.

was untrue, but rather, he feared for his life and also feared that the State would prosecute him and his mother for perjury based on their prior statements to detectives.[39]

Defense counsel also explored the alibi issue with Wilson on cross-examination.  Wilson testified he was not and could not be an alibi witness because he could not lie and say that Favors was gutting his building the night of the murder.[40]  Despite the fact that Wilson's testimony would be offered on behalf of the State, and that it would not be favorable to Favors, however, defense counsel took steps to ensure that Fazande was available to testify as to the alibi issue at trial.  Additionally, given Fazande's testimony discussed above, and that of Detective Locascio regarding charges against Wilson being refused, defense counsel's failure to pursue a line of questioning on cross-examination regarding threats of prosecution fell within the realm of sound trial strategy.  Favors has not shown that defense counsel's performance was deficient.  The state courts' denial of relief on this issue was not contrary to, or an unreasonable application of, Strickland.

### 3.   Allowing Favors to testify in his own defense

---

[39]   Id. at pp. 144-146.

[40]   Id. at p. 126.

Favors contends that counsel was ineffective in placing him on the stand to testify in his own defense, because Favors was "confused by the turn of events, emotionally disturbed, angry and scared."[41] He concedes that he discussed his alibi testimony with defense counsel before trial, but argues counsel failed to consult with him about the new facts which arose during trial before placing him on the stand.

It is well settled that a criminal defendant has the right to testify on his own behalf pursuant to the Fifth, Sixth and Fourteenth Amendments. Rock v. Arkansas, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); Bower v. Quarterman, 497 F.3d 459, 473 (5th Cir.2007); Sayre v. Anderson, 238 F.3d 631, 634 (5th Cir.2001); Jordan v. Hargett, 34 F.3d 310, 312 (5th Cir.1994). A criminal defendant's right to testify is well established, and only the defendant can waive this right, not his counsel. United States v. Mullins, 315 F.3d 449, 452 (5th Cir. 2002). Thus, the ultimate decision lies with the defendant.

Favors clearly made the decision to testify in this case. The

---

[41] Rec. Doc. No. 1, Memorandum in Support, p. 13. Though not specifically listed in his "Issues Presented" under ineffective assistance, it is clear that this issue was presented to all state courts below on post-conviction review.

record reflects that throughout trial, counsel conferred with petitioner.[42]   Favors does not contend that he changed his mind about testifying, and the record does not show that he informed his counsel at any point during trial that he no longer wished to testify.   The fact that counsel allowed him to exercise his right and take the stand to testify even though Favors' alibi testimony conflicted with Wilson's version of the events does not constitute deficient representation.

The state courts' denial of relief on this issue was not contrary to, or an unreasonable application of, Strickland.

### 4. Failure to conduct meaningful investigation and preparation for trial

Finally, Favors contends generally that counsel failed to render a meaningful investigation and properly prepare for trial. Favors argues that counsel should have called two witnesses, Darren Shorty and his girlfriend, to determine what they knew about the note identifying the perpetrators that was left on Fontenot's doorstep.[43] Hill testified that he was not 100 percent sure, but he

---

[42]   State Rec., Vol. 7 of 9 (Day 1), Trial Transcript, p. 29, 79, 99; State Rec., Vol. 8 of 9 (Day 2), Trial Transcript, p. 55, 61, 135, 143.

[43]   Rec. Doc. No. 1, Memorandum in Support, p. 17.

thought Shorty's girlfriend may have written the note.[44]   Favors speculates that it was either Hill or his mother who wrote the note to set Favors up.

"'A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" Moawad v. Anderson, 143 F.3d 942, 948 (5th Cir.1998)(emphasis added, citation omitted); Druery v. Thaler, 647 F.3d 535, 541 (5th Cir.2011).   A petitioner cannot show prejudice as to a claim that his counsel failed to investigate without adducing what the investigation would have shown. Diaz v. Quarterman, 239 F. App'x 886, 890 (5th Cir.2007) (citing Strickland, 466 U.S. at 696, recognizing that some evidence is required to show that "the decision reached would reasonably likely have been different."). Rather, to prevail on such claim, the petitioner must provide factual support as to what exculpatory evidence further investigation would have revealed. Moawad, 143 F.3d at 948; Brown v. Dretke, 419 F.3d 365, 375 (5th Cir.2005); Davis v. Cain, No. 07–6389, 2008 WL 5191912, at *10 (E.D.La. Dec. 11, 2008) (order adopting referenced Report and Recommendation).

---

[44]   State Rec., Vol. 8 of 9, Trial Transcript (Day 2), p. 34.

"'Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.' " <u>Graves v. Cockrell</u>, 351 F.3d 143, 156 (5th Cir.2003) (quoting <u>Buckelew v. United States</u>, 575 F.2d 515, 521 (5th Cir.1978)). In order to demonstrate prejudice arising from failure to call witnesses, the petitioner must show that the witness would have testified at trial and that the testimony would have been favorable. <u>Alexander v. McCotter</u>, 775 F.2d 595, 602 (5th Cir. 1985). There must be a "'reasonable probability' that the uncalled witnesses would have made [a] difference to the result." <u>Id</u>. at 603 (citation omitted).

The record establishes that defense counsel conducted adequate pretrial investigation in this case. Furthermore, the detailed questioning of the witnesses at trial reflects that counsel was well-prepared and well-informed. Nonetheless, even if more could have been done to prepare for trial, under <u>Strickland</u> and its progeny, Favors has failed to demonstrate that, but for counsel's failure to investigate, there is a reasonable probability that a jury would not have found him guilty. Accord <u>Strickland</u>, 466 U.S. at 694.

With regard to defense counsel's failure to call witnesses, Favors has not produced any evidence or affidavits from either Shorty or his girlfriend to establish that they were willing or available to testify at trial.  Nor has he provided more than conjecture as to what they would testify. Favors has not shown that the testimony of these witnesses would have aided his defense as required to establish ineffective assistance.

For the foregoing reasons, Favors has failed to establish that his counsel's performance was deficient or prejudicial.  The state courts' denial of relief on his ineffective assistance of counsel claim was not contrary to, or an unreasonable application of Strickland.

**B.   Introduction of recordings of private telephone calls**

Favors contends that the trial court erred in allowing into evidence recordings of private telephone calls that Favors made to Wilson from the Jefferson Parish Correctional Center, because the State failed to lay a proper foundation for admissibility and because it failed to satisfy the requirements of the Electronic Surveillance Act, La. R.S. 15:1301 et seq. The evidence was admitted over defense counsel's objections and motion to suppress. The State argues that petitioner has not stated a cognizable claim

for federal *habeas corpus* relief insofar as the state court evidentiary ruling on admissibility, and that any Fourth Amendment challenge is barred by <u>Stone v. Powell</u>, 428 U.S. 465 (1976).

Petitioner raised this claim on direct review to the Fifth Circuit Court of Appeal and the Louisiana Supreme Court. The last reasoned state court decision denying relief was issued by the court of appeal, in which it stated:

> Favors assigns two errors for our review. In the first, Favors asserts that admission of the recorded phone calls was error because the State did not lay a proper foundation and because the State did not satisfy the requirements of the Electronic Surveillance Act.[45] Specifically, Favors contends that the State did not prove that he was aware that the calls were being recorded. The State responds that the recorded phone calls were properly admitted into evidence at trial.
>
> In a hearing on a motion to suppress, the State shall have the burden of proof in establishing the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant.[46] A trial court is afforded great discretion when ruling on a motion to suppress, and its ruling will not be disturbed absent abuse of that discretion.[47] In

---

[45]   La. R.S. 15:1301, *et seq.*

[46]   La.C.Cr.P. art. 703(D); <u>State v. Rogers</u>, 09-13 (La.App. 5 Cir. 6/23/09), 19 So.3d 487, 493.

[47]   <u>State v. Lee</u>, 05-2098 (La.1/16/08), 976 So.2d 109, 122, <u>cert. denied</u>, 555 U.S. 824, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008); <u>State v. Rogers</u>, <u>supra</u>.

determining whether the trial court's ruling on a motion to suppress is correct, an appellate court is not limited to the evidence presented at the motion to suppress hearing but also may consider pertinent evidence presented at trial.[48]

It is well established that both the Fourth Amendment to the United States Constitution and La. Const. art. I, § 5 protect people and their privacy against unreasonable governmental intrusion. However, Fourth Amendment rights must be weighed against the governmental and societal interest at stake in maintenance of prisons. The United States Supreme Court has recognized that the limitation of privacy rights of prisoners is acceptable:

A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security.... [49]

The Electronic Surveillance Act generally prohibits the interception and disclosure of wire or oral communications.[50] However, there are exceptions to this general prohibition, such as where one of the parties to the communication consents to its interception.[51]

---

[48] <u>State v. Mollette</u>, 08-138 (La.App. 5 Cir. 11/25/08), 2 So.3d 461, 467, <u>writ denied</u>, 09-155 (La.10/16/09), 19 So.3d 472.

[49] <u>Hudson v. Palmer</u>, 468 U.S. 517, 104 S.Ct. 3194 at 3200, 82 L.Ed.2d 393 (1984).

[50] <u>State v. Esteen</u>, 02-1241 (La. App. 5 Cir. 4/29/03), 846 So.2d 167, 176, writ denied, 03-1486 (La.1/9/04), 862 So.2d 978.

[51] La. R.S. 15:1303(C)(3).

39

In State v. Durham,[52] cited by both the State and Favors in their briefs, the defense filed a motion to suppress the recordings of telephone conversations made when defendant was incarcerated. The motion to suppress was based upon the assertion that interception of telephone communications was prohibited by the Electronic Surveillance Act, because none of the parties to the conversations affirmatively consented to the interception and recordation. The Second Circuit found that defendant did not exhibit a subjective expectation of privacy in the outgoing calls he made from his jail cell, noting that the parties had stipulated that each call contained a warning that it was subject to being monitored and recorded and that defendant had referred to the lack of privacy in several of the calls.[53]

Favors argues that Durham is distinguishable from the matter before us because here there is no stipulation that each call contained a warning that it was subject to being monitored and recorded and that Favors did not refer to the monitoring in the taped conversations. While there is no stipulation to that fact, and no talk of being monitored, we are not swayed by Favors' argument. The Durham court also found that, even if defendant had exhibited a subjective expectation of privacy, which Favors claims he did, it was not one that society was prepared to accept or recognize as reasonable.[54] We find this analysis, given the Supreme Court's pronouncement of the limited expectation of privacy in prisons, to be persuasive. There was testimony offered by the State that a warning is given to parties to a phone call from JPCC that the call may be monitored. Favors does not dispute that fact.

The Durham court stated that no Louisiana court had

---

[52]   43,558 (La. App. 2 Cir. 10/15/08), 996 So.2d 642.

[53]   Id. at 648.

[54]   State v. Durham, 996 So.2d at 648.

interpreted the substance of Louisiana's Electronic Surveillance Act but that the Act was fashioned after its federal counterpart, known as the Omnibus Crime Control and Safe Streets Act.[55] The *Durham* court noted that the Louisiana Act had adopted the two exceptions provided in the federal law: (1) in the ordinary course of duties of investigative or law enforcement officers,[56] and (2) the consent exception.[57] The Second Circuit recognized that consent may be express or implied from surrounding circumstances indicating that the defendant knowingly agreed to the surveillance.[58] The court stated that defendant knew his calls were subject to being monitored and recorded, and it was common and appropriate for prison officials to condition the use of prison telephones on the prisoner's agreement that the calls would be monitored and recorded.[59] The court also found it clear that these calls from the jail phone were monitored and recorded in the ordinary course and duties of the parish sheriff's deputies. The Second Circuit concluded that the Louisiana Act was sufficiently broad to cover local jail facilities and their officers.[60] We agree.

We find the State has made the requisite showing that Favors' telephone calls to Wilson were monitored and recorded in the ordinary course and duties of the Jefferson Parish Sheriff's Deputies, thus making this an exception to the Louisiana's Electronic Surveillance Act. We further find that any expectation of privacy Favors claims relating to the phone calls is not one that

---

[55]   18 U.S.C. § 2510 et seq.

[56]   La. R.S. 15:1302(10)(a)(ii).

[57]   La. R.S. 15:1303(C)(3).

[58]   State v. Durham, *supra*.

[59]   Durham, 996 So.2d at 649.

[60]   Id.

society is prepared to accept or recognize as reasonable.

Accordingly, we hold the tapes were properly introduced into evidence, and we find no merit in this assignment of error.[61]

The Louisiana Supreme Court denied relief without additional stated reasons.

Although Favors argues that the Jefferson Parish Sheriff's Office obtained the recordings in violation of Louisiana law and that the state court admitted the recordings in violation of a Louisiana statute, these matters are not cognizable on habeas review because they are matters of state law. This court does not sit to review the state court's interpretation and application of its own laws.  See Swarthout v. Cooke, ---U.S. ----, 131 S.Ct. 859, 861, 178 L.Ed.2d 732 (2011) (federal habeas review does not lie for errors of state law); Estelle v. McGuire, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); Gonzales v. Thaler, 643 F.3d 425, 429 (5th Cir.2011); Jernigan v. Collins, 980 F.2d 292, 298 (5th Cir.1992).  Moreover, the Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a

---

[61] State v. Favors, 09-1034(La. App. 5th Cir. 6/29/10), 43 So.3d 253, 258-260; State Rec., Vol. 4 of 9 (footnotes in original).

federal court sitting in habeas corpus." <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005) (<u>citing</u> <u>Estelle</u>, 502 U.S. at 67–68; <u>Mullaney v. Wilbur</u>, 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)). Therefore, to the extent that Favors is arguing that the state courts merely misapplied state law with respect to this claim, his claim is not reviewable in this federal proceeding.

Federal courts review the propriety of state court evidentiary rulings only to the extent the proceedings violate due process such that the violation renders the criminal proceeding fundamentally unfair. <u>Lisenba v. California</u>, 314 U.S. 219, 236-237 (1941). In <u>Lisenba</u>, the Supreme Court stated that the denial of due process "is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." <u>Lisenba</u>, 314 U.S. at 236.

First, petitioner has made no allegation, much less any showing, that the admission of the recordings in possible violation of Louisiana law deprived him of his due process rights. Second, any due process claim raised for the first time in this Court would

be improper, because it was not exhausted in the state courts on either direct or post-conviction review. Third, to reach any due process issue, petitioner would have to show that the evidence was erroneously admitted in violation of state law. See Robinson v. Whitley, 2 F.3d 562, 567 (5th Cir. 1993). However, the Louisiana Supreme Court reviewed this issue and upheld the ruling by the Fifth Circuit Court of Appeal, which found the recordings were proper and admissible under the Louisiana Electronic Surveillance Act. (See Charles v. Thaler, 629 F.3d 494, 500-501 (5th Cir. 2011) ("When, as here, a state court's legal conclusions are affirmed by the highest court in that state, those conclusions *are* state law."). This Court will give deference to the state courts' determination under the Electronic Surveillance Act, La. R.S. 15:1301 *et seq*. Petitioner has presented no basis for this court to consider a due process claim.

Furthermore, the State is correct that to the extent petitioner's claim is premised on a purported Fourth Amendment violation,[62] this Court is barred from reviewing it. Stone v. Powell, 428 U.S. 465 (1976). In Stone, the United States Supreme

---

[62] Rec. Doc. No. 1, Petition; Rec. Doc. No. 13, Petitioner's Traverse to State's Response.

Court held: "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at trial." Id. at 494 (footnote omitted); see also Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir.2002). A "full and fair" hearing as contemplated by Stone refers to thoughtful consideration by the factfinder and at least the availability of meaningful appellate review by a higher state court. Davis v. Blackburn, 803 F.2d 807, 808 (5th Cir. 1986) (per curium) (quoting O'Berry v. Wainwright, 546 F.2d 1204, 1213 (5th Cir. 1977). Interpreting Stone, the United States Fifth Circuit Court of Appeals has held:

> An "opportunity for full and fair litigation" means just that: an opportunity. If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, Stone v. Powell bar federal habeas corpus consideration of that claim whether or not the defendant employs those processes. Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir.1978) (emphasis added). "[I]n the absence of allegations that the processes provided by a state to fully and fairly litigate fourth amendment claims are routinely or systematically applied in such a way as to prevent the actual litigation of fourth amendment claims on their merits," the Stone bar applies. Williams v. Brown, 609 F.2d 216, 220 (5th Cir.1980); Christian v. McKaskle, 731 F.2d 1196, 1199 (5th Cir.1984).

The Stone bar applies even if the state court rulings regarding the Fourth Amendment claims were in fact erroneous.   Swicegood v. Alabama, 577 F.2d 1322, 1324 (5th Cir.1978).

Petitioner neither alleges nor demonstrates that Louisiana fails to provide such processes or routinely or systematically precludes litigation of claims such as the one he now raises.   In fact, the record shows that petitioner received a full and fair opportunity to litigate his Fourth Amendment claims.   He had the opportunity to raise the claims both pretrial and on direct appeal.[63]   Thus, absent any plea or proof by petitioner that he was denied a full and fair hearing in state court, his request for federal habeas relief based upon a Fourth Amendment violation is precluded.   Stone, 428 U.S. at 494-95; Bell v. Lynaugh, 828 F.2d 1085, 1091-92 (5th Cir. 1987). Petitioner is not entitled to habeas relief on this issue.

**C.   Restriction of confrontation rights in his effort to cross-examine a witness**

Favors claims that the trial court infringed on his right of confrontation by erroneously restricting defense counsel's cross-

---

[63]   State Rec., Vol. 3 of 9, Omnibus Motions and Order for Pre-Trial Motions (with annexed pretrial motions, *i.e.*, Motion to Suppress statements); see also State Rec., Vol. 7 of 9, Trial Court ruling on Motion to Suppress, May 26, 2009, Transcript, pp. 4-6.

examination of Dominique Hill.  Contrary to the state's argument of partial exhaustion, the Court finds that this claim was fairly presented on direct appeal to the Fifth Circuit and to the Louisiana Supreme Court.  The court of appeal found that the claim was procedurally barred from review for lack of a contemporaneous objection.  In its ruling denying relief, the Louisiana Fifth Circuit Court of Appeal reasoned:

> At the end of Hill's testimony, he told the jury that he pled guilty to accessory after the fact to Mr. Terhune's murder and received a sentence of five-years. Hill also admitted entering a guilty plea to a charge of possession of marijuana with the intent to distribute, for which he received a five-year suspended sentence with a five-year probationary period.
>
> On cross-examination, defense counsel asked Hill when his probation period ended. Hill answered that he still had over three years left on that period. Defense counsel then stated, "You're still on probation, okay. So you would be subject to probation revocation?" The State objected on the basis that the question called for a legal conclusion. The trial court instructed defense counsel to rephrase the question. Defense counsel then asked, "Do you know what the first thing on your probation form was that you're not supposed to do?" The State objected to this question on the basis that it was outside the course of impeachment testimony. The State argued that defense counsel could only ask when Hill pled, what he pled to, and what sentence he received. When the trial court sustained that objection, defense counsel said, "Okay. Let's move on[.]"
>
> In his argument on this assignment of error, Favors concedes that only convictions can be used to impeach

47

credibility as a general rule.[64] However, he asserts that defense counsel should have been able to pursue this line of cross-examination because it was for the purpose of exposing Hill's motivation for testifying. In support of that assertion, Favors argues that case law generally holds that possible or ongoing prosecutions that have not resulted in a conviction can be used to show bias or interest.

The State responds that this issue was not preserved for appeal due to the lack of a contemporaneous objection by the defense. The State further responds that, even if this Court considers the merits of this claim, relief would not be warranted, as the trial judge did not prevent defense counsel from eliciting testimony to support an argument that the potential self-interest of the witness should be considered in weighing his testimony. Finally, the State contends that any error was harmless, as there was overwhelming evidence of Favors' guilt.

We find that defense counsel failed to contemporaneously object to the trial court's ruling, and he acquiesced when the trial judge told him to rephrase the question and when she sustained the State's objection. As such, we find that Favors is precluded from raising this error on appeal.

An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.[65] There is no "magic-word" formula necessary for remarks to constitute an objection.[66] Rather, it is sufficient that a party, at the time of the ruling, makes known to the court the action which he desires the court to take, or of his objections to the action of the court,

---

[64]  See, La. C.E. art. 609.1.

[65]  La.C.Cr.P. art. 841(A).

[66]  State v. Shoemaker, 500 So.2d 385, 388 (La.1987).

together with the grounds therefor.[67] Where the defense counsel acquiesces when the court sustains a State's objection to the examination of a witness, that objection is waived.[68]

State v. Favors, 09-1034(La. App. 5th Cir. 6/29/10), 43 So.3d 253, 261 (footnotes in original).[69]  The Louisiana Supreme Court denied relief without additional stated reasons, and therefore, the Louisiana Fifth Circuit's opinion is the last reasoned decision on the issue.   The State argues that the claim is procedurally defaulted. The Court agrees.

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and adequate to support that judgment. Coleman v. Thompson, 501 U.S. 722, 731–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); Glover v. Cain, 128 F.3d 900, 902 (5th Cir.1997); Amos v. Scott, 61 F.3d 333, 338 (5th Cir.1995) (citing Harris v. Reed, 489 U.S. 255, 260, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)). This "independent and adequate state law" doctrine applies to both

---

[67]   La.C.Cr.P. art. 841; State v. Shoemaker, supra.

[68]   State v. Huizar, 414 So.2d 741, 749 (La.1982).

[69]   State Rec., Vol. 4 of 9.

49

substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review. Amos, 61 F.3d at 338.

Procedural default does not bar federal court review of a federal claim raised in a habeas petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar. Harris, 489 U.S. at 263; Glover, 128 F.3d at 902. "Where the last reasoned state court opinion on a federal claim explicitly imposes a procedural default, there is a presumption that a later decision rejecting the same claim without opinion did not disregard the procedural bar and consider the merits." Lott v. Hargett, 80 F.3d 161, 164 (5th Cir.1996), citing Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). Here, the last reasoned decision of the Louisiana Fifth Circuit relied on the contemporaneous objection rule of La. C. Cr. P. art. 841 to dismiss Favors' claim. In his subsequent request for review of that decision to the Louisiana Supreme Court, that court likewise denied the claims, presumptively resting on the Fifth Circuit's decision below.

For the state law procedural bar to prevent review by this

50

federal habeas court, the bar must be independent and adequate. A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural bar. <u>Amos</u>, 61 F.3d at 338. To be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases. <u>Glover</u>, 128 F.3d at 902. State procedural rules enjoy a presumption of adequacy when the State court expressly relies upon them in deciding not to review a claim, and the burden is on the petitioner to demonstrate otherwise. <u>Id</u>.; <u>Hughes v. Johnson</u>, 191 F.3d 607, 614 (5th Cir.1999).

It is well-settled that the contemporaneous objection rule is an independent and adequate state procedural ground which bars federal habeas corpus review. <u>Wainwright v. Sykes</u>, 433 U.S. 72, 87-88 (1977). Both the "adequacy" and "independence" of the contemporaneous objection rule has been determined by the U.S. Fifth Circuit. See <u>Steward v. Cain</u>, 259 F.3d 374 (5th Cir.2001)(Last reasoned state court judgment rejecting petitioner's claim was based upon contemporaneous objection rule, an adequate and independent state ground); and <u>Duncan v. Cain</u>, 278 F.3d 537(5th Cir.2002) (It is well-settled that the contemporaneous-objection

rule is an independent and adequate state procedural ground"). Therefore, this court finds that Favors is procedurally barred from federal review of this claim unless he can show "cause" for his default and prejudice attributable thereto. Magouirk v. Phillips, 144 F.3d 348, 359 (5th Cir. 1998); Coleman, 501 U.S. at 748-50; Fisher v. Texas, 169 F.3d 295, 301 (5th Cir.1999).

To establish cause, Favors must demonstrate that some objective factor external to the defense impeded his efforts to comply with the State's procedural rule. Murray v. Carrier, 477 U.S. 478, 488 (1986). The failure to show cause is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown. Hoque v. Johnson, 131 F.3d 466, 497 (5th Cir. 1997), citing Engle v. Isaac, 456 U.S. 107, 134 n. 43, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). Here, Favors makes no argument relative to showing "cause" for his default and prejudice attributable thereto in order to excuse his procedural default.[70]

---

[70] Favors does not present this court with any reason to excuse the procedural default of his claim. Nor would this court review any generalized allegation that the state court erred in applying its own state procedural bar. "A basic tenet of federal habeas review is that a federal court does not have license to question a state court's finding of procedural default, if based upon an adequate and independent state ground. " Smith v. Johnson, 216 F.3d 521 (5th Cir. 2000), citing Barnes v. Thompson, 58 F.3d 971 (4th Cir. 1995). In such a circumstance, "[t]he federal court

Thus his claim is barred from federal review unless he can show that a fundamental miscarriage of justice would result if the procedural bar were applied. Finley v. Johnson, 243 F.3d 215, 220 (5th Cir. 2001), citing Murray, 477 U.S. at 495.

To establish a fundamental miscarriage of justice, petitioner must provide this court with evidence that would support a "colorable showing of factual innocence." Kuhlmann v. Wilson, 477 U.S. 436, 454 (1986); accord Murray v. Carrier, 477 U.S. 478, 496; Glover, 128 F.3d 900, 902 (5th Cir. 1997). To satisfy the factual innocence standard, petitioner must establish a fair probability

---

may only inquire into whether cause and prejudice exist to excuse that default, not into whether the state court properly applied its own law." Barnes, 58 F.3d at 974; see also, Rowell v. Dretke, 398 F.3d 370, 375 (5th Cir. 2005) ("[i]t is not the role of the federal habeas court to reexamine state-court determinations of state-law questions."); Johnson v. Cain, 215 F.3d 489, 494 (5th Cir. 2000) (holding that the district court erred in concluding that the state court improperly applied its procedural rules). Accord, Walker v. Warden Louisiana State Penitentiary, 19 F.3d 15, 1994 WL 93289, at *1 (5th Cir. 1994) (holding that it would be improper for a federal habeas court to second guess the state court's compliance with its procedural rules).

Furthermore, to the extent that Favors may claim that ineffective assistance of counsel constitutes cause for the procedural default, his ineffective assistance of counsel claims, as previously noted, have no merit. A meritless ineffective assistance of counsel claim cannot serve as cause for a procedural default. Coleman, 501 U.S. at 753-54.

that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to the defendant's guilt. <u>Campos v. Johnson</u>, 958 F.Supp. 1180, 1195 (W.D.Tx.1997) (footnote omitted); <u>Nobles</u>, 127 F.3d 409, 423 n. 33 (5th Cir. 1997)(actual innocence factor requires a showing by clear and convincing evidence that "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.") When the petitioner has not adequately asserted his actual innocence, his procedural default cannot be excused under the "fundamental miscarriage of justice" exception. <u>Glover</u>, 128 F.3d at 903.

Favors does not present any such claim and the record contains nothing that suggests his actual innocence on the underlying conviction. He presents no evidence or argument of the kind of actual innocence that would excuse his procedural default. Accordingly, this claim is procedurally barred and not subject to this court's habeas review.

**RECOMMENDATION**

**IT IS RECOMMENDED** that petitioner's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed

54

findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc).[71]

New Orleans, Louisiana, this 23rd day of ____January____, 2014.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

---

[71] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

55